Let's call our first case, which is 20-3191, United States v. Portillo-Uranga. Mr. Laron, or the appellant, you may proceed. Good morning. I'm Jonathan Lawrence for Mr. Portillo. To begin with, I'd like to address the argument from the government about waiver and forfeiture. I think it's important to establish a very brief chronology. The suppression motion was filed August 16, 2019. It's ECF document 221, and it's in the Joint Appendix. Specifically, the two arguments I raise about territorial jurisdiction and necessity for the wiretaps is at Joint Appendix 1, pages 65 to 74. The next important date is September 20, 2019. This date and the document that was filed on this date have been left out of the analysis, and I hope that you and your law clerks will go and look at this. This is ECF document 265, and it's Joint Appendix 15, pages 4322 to 4383. Now, I'm going to take blame for this in this regard. It's in the Joint Appendix, and I noticed yesterday, thanks to Mr. Brown, we had a phone call over it, that it was inadvertently omitted by me. I'm the one who typed up the index. But what is this document? This is the government's 62-page response brief to the suppression motion. You'll see at pages 4362 and then 4363 through 4377, Joint Appendix Volume 15, that's where the government addresses the interception argument and the necessity argument. The arguments that were in the August 16th motion laid out very two pages in the district court to respond to that motion. Then, that same day, the government filed ECF documents 263 and 264. 263 is in Volume 5, beginning at page 1195. 264 is at Volume 15, beginning at page 4307. Now, what are these? These are the several thousand pages total of the wiretapped affidavits and applications that were given to Judge Robinson. So, a couple of weeks later, trial counsel files an amended suppression motion. This is ECF document 268, October 8, 2019. It's in Joint Appendix 15, and the pages that are relevant for territorial jurisdiction and necessity are 4394 through 4402. The very next day, October 9, 2019, is when Judge Robinson held her hearing. So, in terms of whether this was properly raised and preserved, not only do you have the documentation, but I'd like to read you something from the government's 62-page response brief. This is in Volume 15, page 4362. It's the 41st page of ECF document 265. This is the government's response. Consistent with the court orders, all monitoring of the 32 target telephones in this investigation occurred within the District of Kansas. Okay, no surprise that that's what they're going to argue. But please, this is it right here. There will be evidence presented in support of this fact at the evidentiary hearing. That's it. That's the government's response to the wiretap, and on the top of the very next page, they go into necessity. And I'm talking, let me back up. That was the government's one-line response to the territorial jurisdiction, like where the calls were intercepted. They say, you know what? We're not going to brief it. We're going to just talk to Judge Robinson about it the next day. So then we have this evidentiary hearing, which was very lengthy, and Judge Robinson ends up leaving and taking it under advisement. She's got two things, the transcript of the evidentiary hearing and thousands of pages of applications and affidavits, and she goes and takes it under advisement and gives a 31-page ruling. Did you make the St. Louis relay argument? Yes, sir. Yes, sir. That's why I gave you the pages. And, you know, I was not trial counsel, so I was very careful to organize my brief along the lines of the suppression motion and the amended suppression motion, so that there's no mystery here. They are verbatim the same. What's the difference? In the amended suppression motion, trial counsel went in, and instead of giving citations to the discovery pages that he had been given, you know, at the beginning of the case to file a suppression motion, he changes the page sites to the actual affidavits and applications. Okay? And then, so, I mean, this thing, it couldn't have been more directly followed, I mean, right down the line. On that, on page 4364 of volume 15, the government talks about Defendant Portillo's motion document 221 makes several assertions why the target telephones failed to establish necessity, and then they track, this is the response brief before Judge Robinson even has a hearing, and they track the exact arguments I make, you know, and I can, you know, read them, claim that normal investigative procedures were successful. Keep going. Normal investigative procedures were successful in phase 2. Then the next page, this is 4369 volume 15. An examination of each affidavit reveals the following. Each traditional investigative technique is thoroughly discussed as investigative events occurred, and it goes on, right? What is really interesting, we get to page 4372, volume 15, government's response brief, claim that the stated purpose of the investigation was already realized. These are arguments, I mean, these are the headings of my brief, but the point being, let's just use some common sense for a second. Well, I'm getting a little lost here. I mean, can you point to me your argument, the specific error by the district court where she abused her discretion in finding out necessity supported the wiretaps? What's, where's the reversible error in the district court? And you're talking about on the necessity issue? I'm not, I'm a little confused. Are you asking me to give you the page of my brief, or are you asking me to summarize the argument? I don't know. I guess, I guess you've confused me with where you are. Are you on the territorial scope? Are you on necessity? I was, I was talking about necessity. So those were necessity arguments that were raised in the trial court addressed by the government in its brief that, and that was filed before the hearing in front of Judge Robinson. My appellate brief tracks the suppression motion. The only difference is I go on to describe the testimony at the evidentiary hearing, the trial counsel could not have briefed the testimony of the agents before the agents testified. So that's all fair game for me. I'm not like my brief is not cauterized. Once that amended suppression motion goes in, I'm allowed to brief what happens at the evidentiary hearing. And when Judge Robinson says I'm taking all of these affidavits under advisement, I'm allowed to brief what she talks about in her 31 page order about those affidavits and applications and I'm allowed, I mean, they're fair game. They're in evidence. And so in my brief, I gave very specific examples with page sites throughout the joint appendix to parts of these applications and affidavits that I believe showed that these agents, they had several years of investigations before they really start, you know, they're tapping phones throughout 2012, actually is when the investigation starts, all the way through 2016 when they get to my guy's phone. And in each of their applications and affidavits and in the government's response, what they're saying is, well, Mr. Phelps, you organize your argument and it's your choice and your I'd like to have you, I would hope you would spend just one minute discussing the two-point enhancement for possession of a firearm with a drug. Yes, sir. I think the key point on the gun issue is, we know this gentleman was involved in a drug conspiracy. We know that when they searched his property in Texas, there were guns found. When they searched the property and the government concedes, there were no guns and no anecdotal, take that back, no guns. I'm sorry, I'm getting confused here. No drugs. Wasn't there a gun? There was a gun. I'm sorry. There were a bunch of guns, but no drugs, right? No, but drug paraphernalia. So the question is, is the in-connection requirement satisfied by the presence of guns with drug paraphernalia, but without actual drugs? When you say paraphernalia, what you're talking about was not drug paraphernalia like a spoon and a needle that are used for drug taking. We had, the government proposed a ledger, a drug ledger that the district court hedged on the side of, it's not a drug ledger because the total dollar amounts ended up being $6,000 and the way it was described was medicine for horses and sheep, and then there were passports and money. So, but the issue here, as I understand it from the government, is that there was testimony that in April of 2017, one of the mules came to the ranch. Where I believe that there's a non sequitur, there's a gap that requires reversal, is there's never been any testimony as to when the guns were first brought to the ranch. So we don't know if the guns were there at the time of this one visit by this one mule, that's number one. Number two, there's no anecdotal evidence that the government provided from any of its cooperating informants that my client ever had a gun during any of the conversations or anything like that. That's the gap. It's a temporal gap in terms of missing time. If I could just briefly, if that answers your question, your honor, I want to make a very brief point about the interception, and I don't mean to be facetious here, but I think it's an important point. I understand that case law suggests that interception is deemed to occur where the call is intercepted, but also where it's listened to. And I'd just like to give you a football analogy because this is why I think that the law is wrong. You watch a football game, quarterback goes back to pass, throws the ball downfield, a guy intercepts it at the 10 yard line, and he runs it back to the 40. We don't say the ball was intercepted at the 10 and the 40. We say the ball was intercepted at the 10. The runback was to the 40. Here, there's no dispute. These calls were all intercepted in St. Louis. Most of them that I've documented occurred outside of Kansas. So you have like Texas-St. Louis interception, Oklahoma-St. Louis interception. The runback is by the government. Would you agree though that our case law forecloses that argument and that the referee in your hypothetical football game would deem the interception to be at the 40? I believe that the case law says that, but I don't think that that forecloses this argument. I believe that this argument refines or suggests that you refine the case law to reflect reality. The government sent the discs to Overland Park. The calls didn't themselves magically appear in Overland Park. It's the government picking the listening post. Right? So if the government's picking the listening post, the government's in complete control of the interception analysis. It's wherever the government wants to send the calls. That's where they're intercepted. I don't think that that's the intent of the statute. I think that interception occurs where it's where the calls caught. And this is the run back. So I understand the case law through today, but I'm suggesting that this panel re-examine that case law because it's not reality. The calls were never intercepted in Overland Park. That's where these agents in St. Louis mailed the disc. They picked it. Well, mailed the disc. Wasn't there real-time listening in Kansas to the interceptions? I may be mistaken. I was under the impression that all of the listening took place in St. Louis, that that's where the listening rooms and the interpreters were all located. I'd like a confirmation of that. So we'll ask the police. Okay. Yeah, if I'm wrong, I'm wrong. Yeah. So the only thing in Kansas was mailing back the transcripts. I believe they're listened to by the agents in Kansas. They're listened to. Yeah, they're analyzed there, but the calls are intercepted in St. Louis. But when they were listened to in Kansas, it wasn't real-time listening. It was listening to a historic document that was shipped to Kansas. My understanding is that these are CDs of calls that have already been recorded and they're sent to Kansas and they're loaded into a computer and then listened to. All right, counsel. I think your time's expired. Mr. Brown, can you clarify that point as you get started? Well, the district court, this is on issue two, and for the record, James Brown appears for the United States. This is on issue two and the district court found that in this case, the redirected communications were all first heard at the DEA's listening post in Overland Park, Kansas. The location of that listening post did not change during the course of this investigation. Therefore, all interceptions took place within the territorial jurisdiction of the district court in Kansas, citing Tabar as a support. I think there was evidence that the calls were first captured at a DEA office in St. Louis, but they were first heard, all the calls were first heard or listened to in Kansas. In real-time. But that doesn't answer my question. Yeah. I mean, that was a very, I don't want to use the word evasive, but it was not, it specifically omitted the actual essence of the question was, was it listened to in real-time? Where did the DEA, or were they merely reviewing an historic document that was shipped to them in Kansas? Your Honor, I don't know if the record answers that question. I don't know the answer. I don't think the record is agnostic on that. Who bears the responsibility? Who has the burden of proof on that? Well, the argument wasn't raised below. So it was never talked about. The argument was raised, the jurisdictional argument was clearly raised that it was captured in Missouri, and therefore it's out of the jurisdiction. So, I mean, there are nuances of information that may or may not have been presented, and we certainly can get to the bottom of what that nuance is. And who has the burden of putting that evidence on? Well, the defendant has the burden to argue that there was a Fourth Amendment violation. We have the burden to show that there was not after he... All right. So the defendant clearly met their argument. They met their burden. They argued it. They put it in issue, square for square. And so then you had the burden to prove it was not a violation, which means you had the burden of proof of going forward, and I'm not sure that you met that if you did not put on any evidence of where these documents... whether this was real-time listening or not, assuming that that's legally relevant. And then my next question is, is that legally relevant or not? Your Honor, with all due respect, the defendant never made the argument the real-time listening did not occur in the District of Kansas. He did not draw the distinction that the court has just... He did challenge. He clearly put in... He clearly put in issue, clearly as a main issue, that it was jurisdictionally defective because it was not heard in Missouri. And I mean, yeah, he didn't... I mean, it was a sad... I mean, it was an unfortunate gap. But the question is, who has the responsibility for putting on evidence? Because right now, we simply don't know. Was it heard in real-time or not in Kansas? Well, Your Honor, he did not make an argument that it was jurisdictionally defective. He said the records were insufficient to allow him to make a conclusion on that point. And then he never argued that it was jurisdictionally defective. And then the real-time arguments, I don't think he's ever even raised that. I think the court is basically raising that argument for him. So we don't think it was put squarely before the court. He didn't make a legal argument before the court. All he said was that the records were insufficient for him to draw a legal conclusion. Therefore, he wanted more information. That was his argument. If you look at volume 15, page 4394, the argument that the court has referenced, that's his whole argument. And it's not on that page. So everything else is just sort of like after-the-fact argument. So this real-time interception argument was never made in the district court. He did not present it to the district court. If he had, we would have produced evidence on that point, but we didn't because he didn't present the argument. Now, the argument that he did present was that this is jurisdictionally defective because the wiretap occurred in Missouri. And then the question is, what evidence came in on that? And there certainly was talk about where it was heard. So, I mean, I don't know whether that raises the issue adequately or not. But I am very concerned about who has the burden of proof, and I think you correctly stated that it is the government's burden to come forward and to defend the wiretap once it has been challenged as being intercepted in a jurisdictionally inadequate venue. Your Honor, he... Do you then have the burden to say, no, it was not, it was not done in an inadequate venue. It was done in a proper venue. And here's the facts to prove that. And I'm wondering, one of the facts is where the real-time listening occurred or if there's a difference. So, let me just ask this question. Legally, do you think there is a difference between the first listening being real-time or being by a shipped cassette or thumb drive or something to a different location? Is there a difference?  That's my question to you. The court is asking me to opine on an issue that was never raised. I'm asking you a question. If you don't want to answer the question, I guess I'll take that as a, you simply don't want to answer it. But I'm asking a question. You can answer it or not. It's your choice. But then you move on to something else. Do you think that it is relevant legally, whether it was preserved or raised or not? I'm not asking that. Is it relevant legally, whether the listening in Kansas, if it was the first listening, was real-time or through a historic document? This is the first time I have ever been noticed this was going to be an issue in this appeal or was an issue in the district court. Do you have an opinion or not on the law on that subject? I will have an opinion after I read the law, but this is the first time I noticed that this was coming up and I'm not trying to be disrespectful, but how can I opine on something that I didn't know that was going to be raised below? That's fine. I accept that. Okay. Thank you. Mr. Brown, on the sensing enhancement, there were guns found at the ranch. There were some cell phones that had been used for the wire taps. There'd been some ledgers and some, you know, money found. But it's your burden to show both physical proximity of the guns to a drug transaction and a temporal proximity under the guideline. How do you establish the, well, first start with the temporal proximity and then finish up with the physical proximity? As to the temporal proximity, the defendant possessed the guns at the time that this whole drug trafficking organization was still intact. This is on December 19th of 2017. At the time that he possessed these guns, the organization was ongoing. Mr. Brown, I'm having a little trouble hearing your argument. Can you move closer to the microphone, please? Yes. Now, I can't hear you at all. Now, you're mute. Barely. Speak up. Would it be better if we have him call in? Might be. Mr. Brown, give us a test audio. And if that doesn't improve, we'll have you call in. Test audio. Better if he's close. Test audio. Can you hear me now? Now, your connection is terrible. All right. Welcome back. We have Mr. Brown on now by telephone. I think before the break, he was just beginning to address a question about the firearms enhancement. And the question was what the record shows regarding the temporal and physical proximity of the guns to a drug transaction for purposes of the guidelines enhancement. All right, your honor, as to a temporal proximity, the temporal relation was established between the guns and the drug trafficking offense because on the date of the search, the conspiracy was ongoing and the defendant was leading it. The organization was taken down on December 19, 2017, which is when we found the guns. And so on the date that we found the guns, the drug trafficking activity was still ongoing. So that's the requisite temporal relation. You're not arguing that there was any evidence that on the date of a specific date when the drugs were at the ranch, there were also firearms. Your entire argument turns on the existence of a drug conspiracy. That's correct, your honor. That's the temporal relation argument we're making. What's the best 10th Circuit case that endorses that? Your honor, I don't know that there's a case on point that endorses that. I think some of the cases talk about how... I think some of the cases... I don't think there's a case on that, your honor. But what we're saying is... Is there a case anywhere? Your honor, not that I know of. But the fact is when you possess the guns in the middle of the ongoing, we think that a temporal relationship is thereby established. That's our view on that. As far as a spatial relationship, if I may continue, that was established because the money, the fictitious identifications, the ledgers, and the gas tank were all found at the ranch and were all related in some way to the defendant's drug trafficking and they were all found in close proximity to the firearms. So that establishes the spatial relation. Now, the defendant raises the issue of, well, there was wasn't a... The guns aren't near drugs and they weren't near a drug transaction. We submit that that's not required by the case law. The cases simply require, referring to the Williams case on page 49 of my brief, that the government can satisfy the spatial... Can satisfy it when it shows that a relationship existed between the weapon, the drug activity, and the defendant. Here, the drug activity is not just the drugs or drug transaction. The drug activity includes handling of money. It includes the obtaining of fake IDs. It includes keeping track of money through drug ledgers. It includes keeping track of drugs through drug ledgers. And here, the drug activity we have, we have money that was found. That's part of the drug activity. We have fictitious identifications found. That's part of the drug activity. We have ledgers that were found. That's part of the drug activity. And we have a gas tank that was used to store drugs. That's part of the drug activity. So, the guns were found in spatial and close spatial connection to these... These items used to carry on the drug activity. And therefore, the spatial relationship is established. The court may want to ask, what is my best case for that? And the case, we think the most on-point case is actually the last case cited in the brief. It's an unpublished... It's an unpublished 11th Circuit case. That would be the Mack case. But the court... This court does have a case. It's published. It's United States v. Humphrey, where they upheld the enhancement where the gun was found in the trunk of a defendant's vehicle that was miles away from the defendant's arrest, where no drugs were found in the trunk of the car, but other items connected with the conspiracy were found, including drug ledgers. And the car was connected to an earlier drug-buying trip. That's on page 55 of my brief. So, we think that we're on pretty solid ground. There doesn't need to be... The gun doesn't need to be found close to drugs or have to be used during a drug transaction. Those are sufficient grounds to support the enhancement, but they're not required. They're not necessary grounds to support the enhancement. So, would the court like me to move to the necessity issue for a brief period of time? Yeah, go ahead. Okay. If the court doesn't have any more questions on that, on issue number three on the gun. Your Honors, we would just ask the court to look at... The District Court's necessity finding on the basis of pages 37 and 38 of our brief. The District Court made eight factual and legal findings that are bullet-pointed on pages 37 and 38 of the brief. Those factual findings are not clearly erroneous. They're all supported by the record. They're not arbitrary. They're not capricious. They don't involve an error of law. And there was no abuse of discretion as to any single one of those findings. And those findings provide the support for the District Court's ultimate legal finding that the government had established necessity for the continued wiretaps. So, we think that that issue is resolvable on the basis of the factual findings the District Court made on pages 37 and 38 that are not resultive of an abuse of discretion. Other than that, Your Honor, we really don't have much to offer. I would like to circle back, if I could, to issue two. Judge Ebel posed some questions about whether the defendant had raised the issue about the real-time recording or real-time listening to calls and whether he had challenged whether the calls had been intercepted in Missouri. We'd just like the court to look at volume 15, page 4394. And that is the entirety of the defendant's argument. It's not even a whole page. It doesn't mention Missouri. It doesn't mention real-time. It doesn't make a legal argument. It just says, we need more facts here. That's what it says. We don't have enough facts to make a legal argument, so we need more facts. That was his argument. It wasn't really even an argument. He didn't make a legal argument. The only legal arguments that are being made are the ones being made on appeal. So, he never raised the issue by making a legal argument. Therefore, this whole issue about real-time— is the sum total of what the defendant presented to the district court? Your Honor, if you look at page 4394, you can see what he's raised. Now, can I recall everything he said at the motion hearing right now because the court asked about sum total? That I don't know, but I can tell you that if you look at this record, that argument about real-time listening is not there. There's no mention about Missouri. There's no mention about anything about these were listened to outside the territorial jurisdiction. It was only saying we need more evidence to find out where the calls were listened to, which is what we provided. That's all we were asked to do. We weren't even asked to respond to a legal argument. So, after you provided that real-time— or the evidence of where they were listened to, did the evidence that you provided reveal that you were listening to recorded, hard copy stuff that was sent to you rather than real-time? Was that information revealed to the defendant? Well, Your Honor, I don't have a perfect recall of the record on that point. I'd have to look at the record. This is the first time I've ever heard the argument made in the entirety of these proceedings, and it was by this court, not even by the defendant. And so, I don't have the ability to answer that question now. I'll certainly look through the record, and by a 28-J letter, I'll tell the court what the answer is, and if it's in the record. But if it's not in the record, we weren't notified that the argument was even being made. You know, we can't respond to arguments that aren't being made. We have the burden, but we don't have to respond to arguments that aren't made. And so, we didn't hear. So, I understand, but I'm intrigued. If the only location of the wiretap argument was that one statement that you quoted to us in the district court, that really is bare bones. And I'm just asking if there was other filings or other occasions where the argument was elaborated upon, because if that is all there is, I really agree with you. That is very bare bones. Well, that's why we're so mystified that the court is making so much of this argument that was not made below. He didn't make the argument below. If he made it, we would have put on mountains of evidence, but he didn't make the argument. There's nothing about Missouri or real-time. It's just this whole, well, we don't have enough information to know if they complied with the territorial jurisdiction requirements. So, we need more evidence. That's all it was. So, that's where we're coming from. We're not trying to be disrespectful. We just can't answer arguments that aren't made. All right. I think your time's expired, and we'd appreciate a 28-J letter if there's any additional information for you or from Mr. Lawrence. Thank you, counsel. Your Honor, may I save everybody some trouble and time here? Because during the break, I actually found the precise answer to Judge Ebell's question, and it's adverse to me. So, I'd like to go ahead and give everybody the page site. You may proceed. Okay. In the evidentiary hearing, it's volume 21, page 5466. And it's the testimony of Agent Nick Wills. And he says that the call hits St. Louis and is routed to Overland Park. The word live is mentioned on page 5466. So, I don't, you know, it might be a little ambiguous, but I think it probably means live. And as I read that part of the transcript, I got to thinking where I got the impression that these were put on CDs and mailed. I think I have inadvertently, and I apologize. I think I convoluted. That's how they sealed them and mailed them to Judge, I believe it's Lungstrom, for storage. So, right? So, I'm sorry, Judge Timcovich. I want to say, Mr. Brown, this is a huge record. I just happened to take a shot in the dark and stumble on that page site. Saves him a Rule 28J letter. Hurts my argument, but that just saves everybody a bunch of time. We appreciate the clarification. It is a huge argument. I have a law clerk that's painfully aware of that and we'll be sure to independently review the record as a part of our disposition in this case. But we appreciate the clarification and the candor from Council. I'd like to add my thanks to both of you on that. It was an issue that wasn't argued much. It's an issue that I am concerned about. So, I wanted your views on it. But given the last concession, I think it's very likely we'll conclude it wasn't preserved in this case. But I do appreciate both of your attempts to clarify for us and your duty to the court to be candid there. So, it is noted and appreciated from both of you. Thank you. Thank you. All right. Thank you, Council. You're excused. Case is submitted.